# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

CLAUDEAN LACKEY,     )
            )
PLAINTIFF,        )  No. 2:12-00101
            )  **Judge Nixon/Brown**
v.             )
            )
MICHAEL J. ASTRUE,     )
COMMISSIONER OF THE SOCIAL  )
SECURITY ADMINISTRATION,   )
            )
DEFENDANT.       )

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

   For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## I.   Procedural History

   The plaintiff protectively filed for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI) under Title XVI of the Act on March 01, 2007 (Docket Entry (DE) 13, p. 159).[1] She claimed an onset date of January 15, 2007 (DE 13, p. 159)[2] and disability due to: migraines, neck pain, leg pain, high blood

---

1 Page numbers herein refer to the Bates Stamp.

2 The court takes notice of discrepant dates within the record regarding the onset date. The plaintiff claimed an onset date of January 15, 2007 at the time of the initial filing on March 01, 2007 (DE 13, p. 159). A claimed onset date of January 15, 2007 also appears in the record at pages 159, 220, 318, and 326. The plaintiff claimed an onset date of November 01, 2006 at the time of subsequent filing on April 20, 2007 (DE 13, pp. 144-45). A claimed onset date of November 01, 2006 also appears in the record at pages 9, 12, 16, 27, 30, 36, 58, 113, 127, 133, 137, 142, 145, 149, 243, 265, 267, 270, 277, 426, and 598. The plaintiff also claims an onset date of November 01, 2006 in her motion (DE 16, p. 4). Finally, the plaintiff claimed an onset date of August 1, 2009 at the time of the third filing on October 06, 2009, filed during the pendency of the initial Appeals Council review request (DE 13, pp. 140-41). The Court construes the onset date to be November 01, 2006 as claimed in the plaintiff's motion.

pressure, and depression (DE 13; p. 318). On March 09, 2007, the Commissioner denied the DIB claim because the plaintiff lacked sufficient work credits to qualify for benefits (DE 13, pp. 156-58). The plaintiff then filed for widow's DIB on April 20, 2007 (DE 13, pp. 144-46). She claimed an onset date of November 01, 2006 (DE 13, p. 145).

On July 06, 2007, the Commissioner denied the DIB and SSI claims (DE 13, pp. 130-31). On October 09, 2007, the plaintiff untimely filed for reconsideration (DE 13, pp. 128-29), explaining the untimeliness with the statement "I am depressed over my husband's death and I haven't been able to do anything." (DE 13, p. 129). On April 17, 2008, the Commissioner again denied the claims (DE 13, pp. 123-27).

On May 16, 2008, the plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (DE 13, p. 119). On March 25, 2009, the plaintiff appeared before ALJ, Jack B. Williams, by a video hearing (DE 13, pp. 596-644). Also appearing was: (1) Julian Nadolsky, the vocational expert (VE) (DE 13, p. 596); and (2) Carl Groves, Jr. (Mr. Groves) a non-attorney representative for the plaintiff (DE 13, pp. 92; 119). On August 05, 2009, the ALJ decided that the plaintiff was not disabled under Title II or Title XVI of the Act (DE 13, pp. 36-37).

On August 12, 2009, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 13, p. 233). On October 06, 2009, the plaintiff filed a second benefits claim, with an onset date of August 1, 2009 and disability due to: migraines, neck pain, leg pain, high blood pressure, and back pain (DE 13, pp. 140-41; 220). On April 20, 2010, an AC granted the request, vacated the hearing decision, and remanded the case to the ALJ (DE 10, pp. 17-19).

On March 22, 2011, the plaintiff appeared again before ALJ, Jack B. Williams, by video (DE 13, pp. 572-95). Also appearing was: (1) Julian Nadolsky, the VE; and (2) Mr. Groves (DE

13, p. 572). On April 08, 2011, the ALJ decided that the plaintiff was not disabled under Title II or Title XVI of the Act (DE 13, p. 16).

On May 09, 2011, the plaintiff timely requested that an AC review the decision (DE 13, p. 6). On August 31, 2012, an AC denied the request (DE 13, p. 2).

On October 29, 2012, the plaintiff timely brought the instant action (DE 1) and her motion for leave to proceed *in forma pauperis* (DE 2) was granted (DE 5) on October 30, 2012. On January 07, 2013, the defendant filed the answer and the record (DE 12-13). On February 08, 2013, the plaintiff filed the motion for judgment on the record (DE 15) and memorandum in support of the motion (DE 16) pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the final decision of the Social Security Administration (the SSA), through its Commissioner, as set out by the ALJ. On March 08 and April 09, 2013, the defendant filed motions for an extension of time to file a response (DE 18; 20). On March 11 and April 09, 2013, the motions were granted (DE 19; 21). On April 17, 2013, the defendant filed a response in opposition (DE 22). On May 07, 2013, the plaintiff filed a reply (DE 23).

The matter is now properly before the Court.

## II.       Review of the Record

### A.       Relevant Medical Evidence

On August 19, 2005, the plaintiff presented to Cookeville Regional Medical Center (Cookeville) Emergency Room (ER) with a headache, vomiting, arm tingling, and light sensitivity (DE 13, p. 550). She was treated and discharged as improved (DE 13, p. 551). On February 10, 2006, the plaintiff presented to Cookeville ER with a headache, nausea, and light sensitivity (DE 13, p. 547). She was treated and discharged as stable (DE 13, p. 548).

On April 24, 2006, the plaintiff presented to Dr. Kimberly Tabor (Dr. Tabor) at Upper Cumberland Family Physicians to establish care (DE 13, p. 404). Dr. Tabor noted the plaintiff's report of hip pain, leg pain, and exacerbation of symptoms after working outside all day (DE 13, p. 404). Dr. Tabor also noted the plaintiff had a history of, inter-alia, hypertension, depression, headache, shortness of breath, chest pain, and fainting (DE 13, p. 404). On September 12, 2006, the plaintiff presented to Dr. Tabor for treatment of fatigue, headache, high blood pressure, and high cholesterol (DE 13, p. 403). Dr. Tabor reported that the plaintiff stated that she had not been taking her medication, that she was having difficulty with her son's military deployment, that her anxiety and depression were worse, and that her headaches resolved when she took an extra dose of medication (DE 13, p. 403). Dr. Tabor reported that the plaintiff had not presented for her follow-up visits as scheduled (DE 13, p. 403).

On November 27, 2006, the plaintiff presented to Cookeville ER with arm and leg tingling. (DE 13, pp. 534-36). She was treated and discharged as improved (DE 13, p. 536). On January 07, 2007, the plaintiff presented to Cookeville ER with a headache, vomiting, lightheadedness, and light sensitivity (DE 13, p. 532). She was treated and discharged as improved (DE 13, p. 533).

On January 18, 2007, the plaintiff presented to the Cumberland Back Pain Clinic (Cumberland Clinic) with, inter-alia, arm, leg, and neck pain, and migraines. (DE 13, p. 564). The provider noted that the plaintiff had decreased range of motion in her cervical spine, normal range of motion in her lumbar spine, normal muscle strength and gait, and a normal psychiatric presentation (DE 13, pp. 564-65). The provider assessed the plaintiff with, inter-alia, migraine headaches, hypertension, neck pain, and low back pain (DE 13, p. 565).

On January 23, 2007, a MRI of the lumbar spine revealed "no evidence of disc herniation or spinal stenosis;" "degenerative disc disease…with disc space narrowing and disc desiccation;" and "no evidence of disc bulge, protrusion, or herniation." (DE 13, p. 567). A MRI of the cervical spine revealed "mild encroachment on the neural foramina." (DE 13, p. 568).

On January 31, 2007, the plaintiff presented to Cumberland Clinic with "no new problems," and on February 21, 2007, a provider at Cumberland Clinic refilled the plaintiff's prescriptions and assessed her with, inter-alia, hypertension and migraines, (DE 13, pp. 560-62).

On March 21, 2007, the plaintiff presented to Cookeville, where Dr. Lauretta Connelly (Dr. Connelly) noted the plaintiff's history of migraines, and hypertension (DE 13, p. 498).

On July 26, 2007, the plaintiff presented to Cookeville ER with chest pain and shortness of breath (DE 13, p. 481). She reported having four similar episodes since June (DE 13, p. 481). The plaintiff was treated and discharged as improved (DE 13, p. 482). On October 01, 2007, the plaintiff presented to Cookeville ER with a 2 day headache, nausea and vomiting (DE 13, p. 480). The plaintiff was treated and discharged as improved (DE 13, p. 579). On February 29, 2008, the plaintiff presented to Cookeville ER with a migraine, pain from vomiting, and "passing out." (DE 13, p. 417). The plaintiff was treated and discharged as improved (DE 13, p. 419).

On November 05, 2010, the plaintiff presented to the Tennessee Department of Health (DOH), where the provider noted a history of depression, high blood pressure, migraine headaches, back pain, and neck pain (DE 13, p. 346). The provider assessed the plaintiff with hypertension, migraine headache, and obesity (DE 13, p. 347). The plaintiff reported that she had taken no medication in eighteen months (DE 13, p. 343). On November 08, 2010, the plaintiff presented to the Tennessee DOH, where the provider noted that a computed tomography (CT) scan of the plaintiff's brain showed a "possible aneurysm." (DE 13, P. 341).

On February 02, 2011, the plaintiff presented to Livingston Regional Hospital (Livingston) with a possible fainting episode, nausea, tingling lips and hand, and a 4 day long migraine (DE 13, p. 330). The provider noted that the November 2010 CT revealed a cyst in the plaintiff's brain, but that another physician in Cookeville determined it was benign (DE 13, p. 330). A follow-up CT revealed the cyst with no changes. The plaintiff was diagnosed with a fainting episode related to headache or low heart rate and a cardiac study revealed "no significant arrhythmia…that would suggest a cause for [the plaintiff's] [fainting]." (DE 13, pp. 331; 333).

On February 03, 2011, the plaintiff presented to the Tennessee DOH for medication refills and reported that her migraine from the day before was "better." (DE 13, pp. 339-40).

A medication record indicates that the plaintiff received prescriptions from Dr. Gunnell and Dr. McCraney between January 2003 and March 24, 2009 for depression, high blood pressure, leg pain, back pain, arthritis, migraines, and water retention (DE 13, p. 236).

### B.    Other Medical and Psychiatric Assessments

On April 25, 2007, Jerrell Killian, MS (Mr. Killian) completed a psychological evaluation of the plaintiff and diagnosed her with depressive disorder and bereavement (DE 13, pp. 468-70). The plaintiff reported to Mr. Killian that she had depression which "comes and goes" and that her migraines were "much improved since she was put on a medication which stops them if she can catch them in time." (DE 13, p. 469). Mr. Killian found that the plaintiff did "suffer from depression to an extent which [was] somewhat more than an adjustment disorder but less than major depression," and found that there were "no psychiatric/psychological symptoms which by themselves would be expected to impair adaptability to the point [the plaintiff] could not maintain simple one and two step vocational activities." (DE 13, p. 470).

On May 09, 2007, Karen Lawrence, Ph.D. (Dr. Lawrence) completed a psychiatric review of the plaintiff and similarly diagnosed her with depression and bereavement (DE 13, pp. 506-19; 509). Dr. Lawrence found "[t]here [was] no evidence that mental symptoms result[ed] in more than non-severe limitations in function." (DE 13, p. 518). The Social Security District Office affirmed this report as written on March 26, 2008 (DE 13, p. 471).

On July 03, 2007, Dr. Mary Payne (Dr. Payne) completed a medical consultant analysis (DE 13, pp. 502-05). She found that the plaintiff's impairments were not severe, singly or combined, and that the results of all exams were normal (DE 13, pp. 502; 505).

On March 18, 2008, Dr. Denise Bell (Dr. Bell) completed a medical consultant analysis (DE 13, pp. 472-75). She found that "based on the objective evidence…the [plaintiff's] physical impairments seem[ed] to be non-severe singly or combined." (DE 13, p. 475).

On November 20, 2009, the plaintiff presented to Jeffrey Scott Herman (Mr. Herman) for a psychological evaluation on behalf of Tennessee Disability Determination Services (DDS) (DE 13, pp. 383-88). Mr. Herman found that the plaintiff had a Global Assessment of Functioning (GAF) of 48 and summarized that:

> The [plaintiff was] capable of understanding and remembering instructions of a simple or detailed nature…The [plaintiff was] moderately limited in her ability to sustain concentration. She was able to remain on task moderately well, but had difficulty remembering things that were set previously when switching tasks. She was able to sustain persistence…She [found] interacting with others subjectively uncomfortable, but she [was] clearly capable of doing so…If a physiological explanation for her reported weakness and pain [was] ruled out, a diagnosis of conversion disorder should be assigned. It [was] very likely that the difficulty with concentration as well as the physical symptoms would improve drastically if the depression were adequately treated.

(DE 13, pp. 387-88). On November 24, 2009, the plaintiff presented to Dr. Donita Keown (Dr. Keown) for a medical examination on behalf of DDS (DE 13, pp. 373-82). The plaintiff reported migraines, hypertension, and chronic low back pain. Upon physical examination, Dr. Keown

found that the plaintiff was 65.5 inches tall and weighed 204 pounds (DE 13, p. 375). She found that the plaintiff had an obese abdomen (DE 13, p. 375). She found that the plaintiff had untreated hypertension, a history of noncompliance with hypertension treatment, headaches that were most likely the result of untreated hypertension as opposed to migraines, neck and back pain, no evidence of disc herniation or spinal stenosis, and no medical impairment of the right knee or of the hip (DE 13, p. 376). Dr. Keown found that the plaintiff could lift or carry up to 100 pounds continuously,[3] meaning more than two thirds of the day, could sit for 2 hours, stand for 1 hour, and walk for 1 hour, and could sit, stand, or walk for a total of 8 hours in a day (DE 13, pp. 377-78). She found that the plaintiff would not require the use of a cane (DE 13, p. 378).

On December 23, 2009, Dr. James Gregory (Dr. Gregory) completed a medical consultant analysis (DE 13, pp. 369-72). He found that the plaintiff's impairments were not severe, either singly or combined (DE 13, p. 369). He found that the plaintiff's statements were "only partially credible as the severity alleged is inconsistent with the objective findings from the evidence in the file." (DE 13, p. 372). Dr. Gregory reported that the plaintiff's pain was considered but also reported that the plaintiff was "noted to exaggerate and to be not fully cooperative." (DE 13, p. 372). He reported that the plaintiff had no significant functional limits as a result of medically determinable impairments (DE 13, p. 372). The Social Security District Office affirmed this report as written on February 24, 2010[4] (DE 13, p. 349).

On February 09, 2010, George T. Davis Ph.D. (Dr. Davis) completed a psychiatric assessment and mental RFC assessment of the plaintiff covering the period of August 01, 2009 to

---

3 *See* DE 13, p. 377. The Court notes the discrepancy between terms used to describe "two-thirds or more of an eight hour day." The term "continuously" is used within the record on SSA forms. The term "constantly" is used in the Social Security Administration, *Program Operations Manual System* (POMS) § **DI 25001.001 (Medical–Vocational Quick Reference Guide)**, *available at* ihttps://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001.

4 The Court notes that the date listed at DE 13, p. 349 is 15/23/09, which the Court construes as an error. The Court presumes that 12/23/09 is correct since this corresponds to the date of the medical consultant analysis.

February 09, 2010 (DE 13, pp. 351-54). He found that the plaintiff was capable of understanding and remembering simple and multistep instructions, was capable of attending to simple and multistep tasks, had limited concentration but could attend to said tasks for periods of at least 2 hours in an 8 hour day and complete a routine workweek, was capable of appropriate social interaction, and was capable of adapting to change (DE 13, p. 353). He diagnosed that the plaintiff had a GAF of 48, major depressive disorder, single episode, without conversion disorder[5] (DE 13, pp. 358; 361; 367). [6] The Social Security District Office affirmed this report as written on February 22, 2010 (DE 13, p. 350).

### C.    Testimonial Evidence

### 1.    Plaintiff Testimony at Second Hearing

On March 22, 2011, Mr. Groves informed the ALJ that he had seen the record, that there was nothing outstanding that should have been in the record, and that he was satisfied that the record was complete (DE 13, pp. 575-76). The plaintiff then testified on direct examination by Mr. Groves (DE 13, pp. 577-86). The plaintiff testified that she was fifty-three years old, that she had not obtained a General Education Degree (GED), and that she had not received any vocational training after high school (DE 13, p. 577). Mr. Groves asked the plaintiff to explain what kept her from working (DE 13, p. 578). The plaintiff testified that she has severe pain in her neck, that the pain causes severe migraines, and that she has severe pain and spasms in her lower

---

5 Dorland's Illustrated Medical Dictionary 848 (Elsevier 2012) (1900) (Conversion Disorder: "a mental disorder characterized by conversion symptoms (loss or alteration of voluntary motor or sensory function suggesting physical illness…) having no demonstrable physiological basis….").

6 The Court notes the following discrepancy in the report of Dr. Davis: On DE 13, p. 361, he notes that "[a] medically determinable impairment [(MDI)] is present that does not precisely satisfy the diagnostic criteria above" and lists "conversion disorder" as the MDI. However, the instructions immediately below this indicate that "[p]ertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment" must be listed in section IV. In section IV, on DE 13, p. 367, however, Dr. Davis notes that the plaintiff's diagnosis was *without* conversion disorder. Therefore, the Court notes this discrepancy and, because there are no pertinent symptoms, signs, or laboratory findings listed in section IV to substantiate the presence of conversion disorder, the Court construes the record to indicate that Dr. Davis did *not* diagnose the plaintiff with conversion disorder.

back (DE 13, p. 579). She testified that she has had these conditions for the past four or five years (DE 13, p. 579).

The plaintiff testified that her neck problems cause tingling in her hands, make it difficult for her to raise her arm, and cause pain in her shoulders (DE 13, p. 579). She testified that she has tingling in her hands about twice a week, in conjunction with migraines, and that she drops items "every other day." (DE 13, p. 579). She testified that she could only lift or carry five or ten pounds, and that the symptoms are worse in her right hand (DE 13, pp. 579-580). She testified that she has difficulty looking from side to side because of her neck pain, but that she is able to drive (DE 13, p. 580). She testified that the pain radiates into her arms (DE 13, p. 580).

The plaintiff testified that her back pain radiates down to her ankles, sometimes only in her right leg (DE 13, pp. 580-81). She testified that she has trouble standing or walking because of her back problems and explained, "I can walk to the mailbox. I have a long driveway. By the time I get back to the house, I'm just out of breath." (DE 13, p. 581). The plaintiff testified that she is able to alternate sitting and standing during an 8 hour workday, she could stand or walk for 1 hour total over the course of the day and that she could sit for about 3 hours total over the course of the day (DE 13, p. 581). The plaintiff testified that she spends most of the day "lying down." (DE 13, p. 582). She testified that her pain medication "puts [her] to sleep." (DE 13, p. 582) She testified that, on a normal day, her pain level with the pain medication reaches a 6 on a 1 to 10 scale, with 10 indicating severe agony (DE 13, p. 282).

The plaintiff testified that she has had migraines since her onset date of November 2006 (DE 13, p. 582). Mr. Groves asked the plaintiff to describe her migraines and she testified:

> I wake up in the night and my head is throbbing real bad, and I can get up in the morning and have a real bad migraine and it's just like the whole top of my head is coming off. A lot of time it starts…in the back of my neck and it comes around, and sometimes I have to sit and push in on my temples to help the pain.

(DE 13, p. 583). The plaintiff testified that she has a migraine "sometimes twice a week" and that, on average, they last for 8 to 12 hours but can last up to 2 days (DE 13, p. 583). She testified that her migraine medication "puts [her] down to sleep" and interferes with her ability to concentrate "all the time" (DE 13, pp. 583-84). Mr. Groves asked the plaintiff whether she could do a job "where there were 2 pieces of a pen coming by on a conveyor belt and [her] job was simply to pick them up, screw them together, put them back on the conveyor belt…for increments of about 2 hours." (DE 13, p. 584). The plaintiff testified that the pens would "be flying past [her]" because she would "be thinking about something else and...just…can't concentrate." (DE 13, p. 584).

The ALJ asked the plaintiff to explain her preference not to be around other people and she testified that should would "rather be by [herself]." (DE 13, p. 585). She testifies that about once a week, she will "just fly off the handle" when she gets mad, and that she gets mad if someone criticizes her on a task (DE 13, p. 585). The plaintiff testified that in her previous employment, she would either be fired because of her migraines and her inability to concentrate or that she would quit because of her pain (DE 13, pp. 585-86).

The plaintiff next testified on direct examination by the ALJ (DE 13, pp. 586-90). The plaintiff testified that she takes medication for migraines and that while the medication will sometimes help, she will sometimes require treatment at the ER (DE 13, pp. 586-87). She testified that she takes medication for high blood pressure, and that she always takes her medication as prescribed (DE 13, p. 587). However, the ALJ asked about the evidence in the record indicating that the plaintiff had not taken any medication in 18 months (DE 13, p. 587). The plaintiff testified that she had no insurance and could not afford her medication (DE 13, p. 587). The ALJ asked about evidence in the record indicating that the plaintiff reported to a

psychologist in April 2007 that her migraines were improved since being put on medication (DE 13, p. 587). The plaintiff testified that instead, the migraines were "a little bit worse." (DE 13, p. 587). The plaintiff testified that she has not had any neck or back surgery, that she drives once a week, and that she has no income (DE 13, p. 588).

## 2.    Vocational Expert Testimony at Second Hearing

The VE testified that the plaintiff's past work as a stocker is medium,[7] unskilled[8] work (DE 13, p. 590). The ALJ then presented the VE with a hypothetical scenario:

> A person approaching 54 years of age, who has a limited education, and past relevant work identical to that of the plaintiff. The person would be limited to light exertion. The person would have decreased concentration which would not preclude simple work but would preclude detailed work or complex work. The person could relate superficially with others, and could adapt to routine work occasionally.

(DE 13, p. 590). The VE testified that, under this hypothetical, the plaintiff could not perform her past relevant work as a stocker because "[p]ast relevant work requires too much lifting." (DE 13, p. 590). The VE testified, however, that there would be other light, unskilled jobs within the limitations of the hypothetical that the plaintiff could perform (DE 13, p. 591). These jobs include a folder, sorter, tagger, counter attendant, board girl in a cafeteria, wrapping machine tender, cushion stuffer, gasket inspector, electrical accessory assembler, and bottling line attendant (DE 13, p. 591). The VE testified that there were approximately 800 such positions within 75 miles of Cookeville and 1,000,000 positions nationally (DE 13, p. 639).

In response to questioning by the ALJ, the VE testified that, if the plaintiff's testimony was correct, the plaintiff would not be able to work at all (DE 13, p. 592). The VE then testified on direct examination by Mr. Groves (DE 13, pp. 592-94). Mr. Groves partially adopted the

---

7 20 C.F.R. §§ 404.967 and 416.1467 ("To determine the physical exertion requirements of work in the national economy, [jobs are classified] as *sedentary, light, medium, heavy, and very heavy*.") (emphasis added).

8 20 C.F.R. §§ 404.968 and 416.1468 ("In order to evaluate [the plaintiff's] skills…occupations are classified as *unskilled, semi-skilled, and skilled*.") (emphasis added).

hypothetical that the ALJ presented. Mr. Groves' hypothetical added an individual who would be limited to "occasional bilateral fine manipulation and frequent bilateral gross manipulation" with the limitations worse in her right hand (DE 13, pp. 592-93). The VE testified that the limitation of frequent bilateral gross manipulation would not change his prior testimony in response to the ALJ's hypothetical (DE 13, p. 593). The VE testified that the limitation of occasional bilateral fine manipulation would reduce the number of jobs "by about 20 percent." (DE 13, p. 593).[9]

Mr. Groves' second hypothetical partially adopted the hypothetical that the ALJ presented and added an individual who would have frequent lapses in concentration and frequent problems completing tasks. The VE testified that these limitations would prevent the plaintiff from working at any occupation (DE 13, pp. 593-94).

### III. Analysis

### A. Standard of Review

The issue before the Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is limited to whether there is substantial evidence in the record to support the Commissioner's findings of fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting

---

9 The Court notes that the VE further testified that the jobs he listed "[do not] require more than gross manipulation." (DE 13, p. 593). If the jobs do not require more than gross manipulation, it is inconsistent to indicate that a fine manipulation limitation would reduce the number of jobs. Despite this inconsistency, if the number of jobs was reduced by 20 percent, the number of local jobs would equal 640 instead of 800. Under 42 U.S.C. § 423(d)(2)(A), "[a]n individual shall be determined to be under a disability only if his…impairments are of such severity that he is *not only unable to do his previous work but cannot*, considering his age, education, and work experience, *engage in any other kind of substantial gainful work which exists in the national economy*….mean[ing] work which exists in *significant numbers* either in the region where such individual lives or in several regions of the country." (emphasis added). In determining what constitutes a *significant number* of jobs, courts use a case-by-case determination. *Nejat v. Comm'r of Soc. Sec.*., 359 F. App'x 574, 579 (6th Cir. 2009) (citing *Hall v. Bowen*, 837 F.2d 272, 274-75 (6th Cir. 1988)). As the 6th Circuit held, as few as 500 jobs may constitute a significant number of jobs for purposes of 42 U.S.C. § 423(d)(2)(A). *Nejat*, 359 F. App'x at 579. Here, the plaintiff has not argued that the number of jobs fails to constitute a *significant number*, and the Court does not reach this conclusion sua sponte.

*Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x at 434. If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

## B. Administrative Proceedings

Disability is defined for Title II DIB and Title XVI SSI claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1505 and 416.905.

Under the Act, a widow or widower of an insured deceased spouse is entitled to widow's DIB benefits if they are at least fifty years of age, they are disabled, and their disability "started not later than 7 years after the insured died or 7 years after [they] were last entitled to…widow's or widower's benefits based upon a disability, whichever occurred last." 42 U.S.C. § 402(e); 20 C.F.R. §§ 404.335(c).

The ALJ uses a 5 step sequential evaluation for both DIB and SSI claims to determine whether the plaintiff meets the definition of "disabled." 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

i. If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii.    If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii.    If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv.    The court considers the plaintiff's RFC and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v.    The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

The plaintiff has the burden of proof for steps 1 to 4. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step 5, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* To meet the burden, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. §§ 404.1569 and 416.969.

Appendix 2 is referred to as "the grid," and provides guidance to the ALJ in determining whether the plaintiff is disabled or whether significant numbers of *other* jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to a particular individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. §§ 404.1569 and 416.969.

### C.    Administrative Reliance on Vocational Expert Testimony

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to

whether the plaintiff is disabled or whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004). If an "issue in determining whether [a plaintiff] is disabled is whether [their] work skills can be used in other work and the specific occupations in which they can be used…, [the ALJ] may use the services of a VE…." 20 C.F.R. §§ 404.1566(e) and 416.966(e).

## D. Notice of Decision

On March 22, 2011, the ALJ denied the plaintiff's claims and made the findings of fact and conclusions of law enumerated below.

1. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Act.

2. The prescribed period ends on April 30, 2014.

3. The claimant has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date.

4. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease, hypertension, and headaches.

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

6. The claimant has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk/sit for 6 hours each in an 8-hour workday with normal breaks. The claimant has decreased ability for concentration that would not preclude simple work but would preclude detailed or complex work. She can relate superficially with others and can adapt to routine work changes.

7. The claimant is unable to perform any past relevant work.

8. The claimant was born November 20, 1956 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age.

9. The claimant has a limited education and is able to communicate in English.

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

11. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

12. The claimant has not been under a disability, as defined in the Act from November 1, 2006, through the date of this decision.

(DE 13, pp. 11-16). On March 22, 2011, the ALJ made the specific decisions below.

1. Based on the application for disabled widow's benefits protectively filed on March 01, 2007, the claimant is not disabled under sections 202(e) and 223(d) of the Act.

2. Based on the application for SSI protectively filed on March 01, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Act.

(DE 13, p. 16).

## IV.     Claims of Error

### A.     Whether the ALJ failed to consider the effects of Plaintiff's obesity

The plaintiff argues:  (1) that the ALJ erred by failing to consider the effect of the plaintiff's obesity *at each step* of the disability evaluation, as required by Social Security Ruling (SSR) 02-1P (DE 16, p. 12); and (2) that, by failing to consider the effect of the plaintiff's obesity, the ALJ failed to comply with the remand order of the AC (DE 16, p. 14).

SSR 02-1P "provide[s] guidance on SSA policy concerning the evaluation of obesity in disability claims...."[10] In any disability claim, the ALJ uses a 5 step disability evaluation, as explained above.[11] Medical conditions are irrelevant at the first step because the first step pertains to whether the plaintiff is engaged in substantial gainful activity.[12] At the second step, "[a]s with any other medical condition, [the ALJ] will find that obesity is a 'severe' impairment

---

10 SSR 02-1P, 2000 WL 628049.

11 *See supra* Part III.B.

12 20 C.F.R. §§ 404.1520(b) and 416.920(b) ("If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.").

when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."[13] The ALJ will "generally rely on the judgment of a physician who has examined the [plaintiff] and reported his or her appearance and build, as well as weight and height" in order to identify obesity as a medically determinable impairment.[14] At the third step, the ALJ considers whether (1) obesity *meets* the requirements of a listing in Appendix 1 (the listings); and whether (2) obesity is *medically equivalent* to a listing.[15]

At the fourth and fifth steps, the ALJ considers obesity in assessing RFC and must explain how they reached a conclusion "on whether obesity caused any physical or mental limitations."[16] SSR 02-1P also explains part of SSR 96-8P, which specifically addresses the RFC assessment. SSR 96-8P indicates that "age and body habitus are not factors in assessing RFC"[17] and the direction, to *not* consider age and body habitus in the assessment of limitations, also appears on the SSA Medical Source Statement of Ability to do Work Related Activities (DE 13, p. 377). SSR 02-1P explains that SSR 96-8P includes this language in order to distinguish "between individuals *who have a medically determinable impairment of obesity* and individuals *who do not*."[18] As SSR 02-1P explains, SSR 96-8P goes on to include the statement that "[i]t is incorrect to find that an individual has limitations beyond those *caused by his or her medically determinable impairment(s) and any related symptoms* due to such factors as age and natural body build, and the activities the individual was accustomed to doing in his or her previous

---

13 SSR 02-1P at *4.

14 SSR 02-1P at *3.

15 SSR 02-1P at *5.

16 SSR 02-1P at *6-7.

17 SSR 96-8P at *1.

18 SSR 02-1P at *7 (emphasis added).

work."[19] In other words, when the ALJ does "identify obesity as a medically determinable impairment…[they] will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that [they] identif[ied]."[20] The language regarding age and body habitus does not, therefore, preclude a provider from finding the impairment of obesity or the ALJ from considering obesity in the RFC assessment.

The record shows that on November 24, 2009, Dr. Keown found that the plaintiff was 65.5 inches tall and weighed 204 pounds, with an "obese abdomen." (DE 13, p. 375). On November 05, 2010, the provider at the Tennessee DOH listed obesity as one of the plaintiff's problems (DE 13, p. 347). On February 03, 2011, the provider at the Tennessee DOH noted that the plaintiff had a BMI of 34.7 and weighed 213 pounds (DE 13, p. 339).

The record shows that at the second step, the ALJ properly considered the plaintiff's impairments. The ALJ found the plaintiff had the severe impairments of cervical and lumbar degenerative disc disease, hypertension, and headaches (DE 13, p. 16). The ALJ found that these impairments, but not the plaintiff's obesity, significantly limited the plaintiff's ability to do basic work activities. The ALJ noted that "[g]iven the minimum quantum of evidence necessary to establish a severe impairment," the impairments which he found to be severe "place[d] restrictions on the [plaintiff's] ability to engage in work activity." (DE 13, p. 16). The ALJ went on to explain that the plaintiff's purported impairment of depression and problems with social interaction, concentration, persistence, and pace caused no more than minimal or mild limitation. (DE 13, p. 16). The record shows that the ALJ did not err by finding the aforementioned severe impairments, and not listing obesity among them, because the record did not support listing

---

19 SSR 02-1P at *7 (emphasis added); SSR 96-8P 1996 WL 374184.

20 SSR 02-1P at *7.

obesity as a severe impairment. The plaintiff's obesity was not listed on the plaintiff's initial claim for disability on March 01, 2007 (DE 13, p. 159). The plaintiff's obesity was not listed when she applied for reconsideration on October 09, 2007, and stated that she had "no additional evidence to submit." (DE 13, p. 128) The plaintiff's obesity was not listed on the plaintiff's second claim for disability on October 06, 2009 (DE 13, pp. 140-41). Finally, neither the plaintiff nor Mr. Groves alleged that obesity limited the plaintiff's abilities at either the initial hearing or the second hearing (DE 13, pp. 572-644). Therefore, the record shows that the ALJ considered the plaintiff's impairments, and obesity was not supported as a severe impairment.

The record shows that at the third step, the ALJ properly considered the plaintiff's impairments. The ALJ found that "[n]o treating or examining physician ha[d] suggested the presence of any impairment or combination of impairments of *listing level severity*." (DE 13, p. 16) (emphasis added). The ALJ "considered the listings pertinent to [the plaintiff's] alleged impairments and [did] not find any present criteria set forth…to warrant a finding that the [plaintiff] meets or equals any listing." (DE 13, p. 16). Not only did the plaintiff's obesity fail to meet or equal any of the listings, but all of the plaintiff's impairments failed to do so. The record shows that the plaintiff's providers documented the plaintiff's weight, but did not document any symptoms, complaints, or details related to it. Therefore, the record shows that at the third step, the ALJ properly considered the listing level severity of the plaintiff's impairments.

The record shows that at the fourth and fifth steps, the ALJ considered the plaintiff's obesity to the proper extent when assessing RFC, as required under SSR 02-1P and SSR 96-8P. The ALJ acknowledged the plaintiff's weight, noting that Dr. Keown documented the plaintiff's weight at 204 pounds in November 2009 (DE 13, p. 14). The ALJ referenced Dr. Keown's entire report (DE 13, p.14). Within that report, Dr. Keown documented that the plaintiff had an obese

abdomen (DE 13, p. 375). The ALJ acknowledged the providers at the Tennessee DOH "assessed the plaintiff with obesity" in November 2010, when the provider listed obesity as one of the plaintiff's problems, and in February 2011, when the provider noted the plaintiff's weight and BMI of 34.7 (DE 13, p. 14 citing DE 13, pp. 339; 347). The ALJ, therefore acknowledged the plaintiff's obesity, which was described, at most, in the record during an objective abdominal exam and as a part of the plaintiff's medical problems. The ALJ appropriately relied on Dr. Keown's report, as well as the reports from the providers at the Tennessee DOH. The ALJ included all indications of the plaintiff's weight, BMI, and obesity from the record, although the indications in the record were brief and the documentation of associated limitations was absent (DE 13, p. 14). Therefore, the record shows that the ALJ considered the plaintiff's obesity in assessing RFC and could not conclude that obesity caused any physical or mental limitations because nothing in the record suggested any such limitations.

The plaintiff also argues that, by failing to consider the effect of the plaintiff's obesity, the ALJ failed to comply with the remand order of the AC (DE 16. p. 14). The remand order instructed the ALJ to, inter-alia, "give further consideration to the [plaintiff's] maximum RFC and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations," in compliance with 20 §§ C.F.R. 404.1545 and 416.945; SSR 85-16; 96-8P (DE 13, p. 19). The record provides substantial evidence that the ALJ did comply.

To the extent that the plaintiff's argument rests on the threshold assertion that the ALJ failed to consider the effect of the plaintiff's obesity, the record shows that this assertion is meritless, as explained in the preceding paragraphs. Also, the record shows that the ALJ did give further consideration to the plaintiff's maximum RFC, as evidenced by a comparison between the RFC determinations at the initial and the second hearing (DE 13, pp. 32-35; 12-15). At the

initial hearing, the ALJ found that the plaintiff had the RFC "to perform light work as defined in 20 §§ C.F.R. 404.1567(b) and 416.967(b) except the claimant is limited to simple work with one to two step operations," (DE 13, p. 32) whereas at the second hearing the ALJ elaborated and found that the plaintiff had the RFC:

> [T]o perform light work as defined in 20 §§ C.F.R. 404.1567(b) and 416.967(b) *except lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk/sit for 6 hours each in an 8-hour workday with normal breaks. The [plaintiff] has decreased ability for concentration that would not preclude simple work but would preclude detailed or complex work. She can relate superficially with others and can adapt to routine work changes.*

(DE 13, p. 13) (emphasis added). Additionally, the record shows that the ALJ gave further consideration to the plaintiff's maximum RFC, as evidenced by the ALJ's questioning of the VE. At the initial trial, the ALJ presented a hypothetical to the VE, to which the VE testified that the plaintiff could not perform past relevant work but could perform other light, unskilled jobs (DE 13, p. 639). The ALJ offered no follow-up questioning regarding the limitations that the plaintiff alleged (DE 13, p. 639). In comparison, at the second hearing, the ALJ questioned the VE as to whether his testimony would change if the plaintiff's testimony regarding her limitations was correct (DE 13, p. 592). In response, the VE testified that the plaintiff would not be able to work at all if her testimony about her limitations was correct (DE 13, p. 592). Notably, again, the plaintiff never testified that one of her limitations was her obesity (DE 13, pp. 572-644). Therefore, the record provides substantial evidence that the ALJ did give further consideration to the plaintiff's maximum RFC in the second hearing, in accordance with the order of the AC.

Therefore, the record provides substantial evidence that the ALJ properly considered the plaintiff's obesity and properly followed the remand order of the AC.

**B.       Whether the ALJ failed to develop the record**

The plaintiff argues:  (1) that the ALJ erred by failing to meet a basic duty to develop the record, specifically by failing to request an updated consultative examination; and (2) that the ALJ failed to meet a special duty to develop the record, triggered by the fact that the plaintiff was represented by a non-attorney.

Under 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2), the ALJ has the basic duty to develop the plaintiff's complete medical history, meaning that for a plaintiff who alleges an onset date "less than 12 months before [they] filed…, [the ALJ] will develop [the] complete medical history beginning with the month [the plaintiff] say[s] [their] disability began unless [the ALJ has] reason to believe [the] disability began earlier." 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2). Also, where applicable, the ALJ will develop the plaintiff's "complete medical history for the 12 month period prior to…the  month ending the 7–year period [the plaintiff] may have to establish [their] disability [when the plaintiff is] applying for widow's or widower's benefits based on disability." 20 C.F.R. §§ 404.1512(d)(2)(2) and 416.912(d)(2)(2).[21]

The record shows that the plaintiff alleged an onset date of November 01, 2006 (DE 13, p. 145), which is less than 12 months before she filed her initial filing on March 01, 2007 (DE 13, p. 159) and her subsequent filing on April 20, 2007 (DE 13, pp. 144-45). The record does not show that the ALJ had reason to believe that the disability began earlier. Since the ALJ considered the medical history beginning on August 19, 2005, this development of the plaintiff's medical history met the basic duty to develop the record (DE 13, p. 550). Since the plaintiff is applying for widow's benefits and the record shows that the ALJ developed the plaintiff's

---

21 Here, the plaintiff's husband died on April 15, 2007 (DE 13, p. 599). Therefore, the plaintiff would have needed to establish that her disability began within 7 years of that date, April 30, 2014, in order to establish entitlement to widow's disability benefits (DE 13, p. 10).

medical history through February 03, 2011, as far as possible given the second hearing date of March 22, 2011, this development of the plaintiff's medical history also met the basic duty to develop the record (DE 13, p. 339).

An ALJ will order a consultative examination if "sources cannot or will not give [the SSA] sufficient medical evidence….." 20 §§ C.F.R 404.1517 and 416.1517. However, the "decision to purchase a consultative examination will be made on an individual case basis," and an ALJ "is not obligated to refer a plaintiff for a consultative evaluation unless he deems there is insufficient evidence in the record to make [a] RFC determination." 20 §§ C.F.R 404.1519 and 416.1519; *Dickie v. Astrue*, 3:11-0585, 2012 WL 3285624 (M.D. Tenn. July 20, 2012) report and recommendation adopted, 3:11-0585, 2012 WL 3283458 (M.D. Tenn. Aug. 9, 2012) (citing *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009) citing 20 C.F.R. §§ 404.1517 and 416.917)). The Sixth Circuit has held that an ALJ has discretion "to determine whether further evidence, such as additional testing, is necessary" and that this discretion is subject to an abuse of discretion standard. *Hayes,* 357 Fed. Appx. at 675.

The record shows that on November 24, 2009, the plaintiff presented to Dr. Keown for a consultative medical examination on behalf of DDS. This was *after* the initial hearing on March 25, 2009 and *after* the plaintiff requested an AC review on August 12, 2009, but before the AC remanded the case to the ALJ on April 20, 2010 and 16 months before the second hearing on March 22, 2011 (DE 13, pp. 373-82). The plaintiff does not argue that the ALJ abused his discretion by failing to order an initial examination. What the plaintiff argues, instead, is that the ALJ abused his discretion by failing to order a second consultative examination (DE 16, p. 18).

The record shows that this argument is without merit because the record shows that there was sufficient evidence in the record for the ALJ to make a RFC determination at the second

hearing, such that the ALJ did not abuse his discretion by relying on the November 24, 2009 consultative examination. *After* the initial hearing on March 25, 2009, the plaintiff not only presented for the consultative examination, but also presented for additional medical visits that the ALJ considered at the second hearing. On November 20, 2009, the plaintiff presented to Mr. Herman for a psychological evaluation on behalf of DDS (DE 13, pp. 383-88). The ALJ considered this evidence, noting that "Mr. Herman, SPE, consultatively performed a psychological evaluation…." (DE 13, p. 14). On December 23, 2009, the plaintiff presented to Dr. Gregory for a medical consultant analysis (DE 13, pp. 369-72). This was the only visit which the ALJ did not specifically mention in his decision.  On February 09, 2010, the plaintiff presented to Dr. Davis for a psychiatric assessment and mental RFC assessment for the period of August 01, 2009 to February 09, 2010 (DE 13, pp. 351-54).  The ALJ considered this evidence, noting that "the [plaintiff's] mental capacity limitations are consistent with the medical source statement of the State Agency psychologist who noted no more than mild mental limitations." (DE 13, p. 13). On November 05 and 08, 2010, and February 03, 2011 the plaintiff presented to the Tennessee DOH for examination and treatment (DE 13, pp. 346; 339-40). The ALJ considered this evidence, noting that "the [plaintiff] received treatment at the local Department of Health during the period of November 2010 through February 2011." (DE 13, p. 14).  On February 02, 2011, the plaintiff presented to Livingston (DE 13, p. 330). The ALJ considered this evidence, noting that "the [plaintiff] was admitted to the local hospital in February 2011 with complaints of migraine headache and fainting." (DE 13, p. 14). Therefore, the record shows that the ALJ had sufficient evidence on which to rely during the second hearing and did not abuse his discretion by not ordering a second examination.

Finally, the plaintiff argues that the ALJ failed to meet a special duty to develop the record, triggered by the fact that the plaintiff was represented by a non-attorney. Whether an attorney or a non-attorney represented a plaintiff at a hearing before an ALJ is not dispositive on the issue of whether the ALJ was under a special duty to develop the record, or on the issue of whether a remand is required. Instead, the Court will "examine each case on its own merits to determine whether the ALJ failed to fully develop the record and therefore denied the claimant a full and fair hearing." *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 344-45 (6th Cir. 2008) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986)). Indeed, "federal regulations permit claimants to choose non-attorneys to represent them at the administrative level." *Kidd*, 283 F. App'x at 345 (citing 42 U.S.C. § 406(a); 20 C.F.R. §§ 404.1705(b) and 416.1505(b)). Succinctly, Sixth Circuit precedent establishes that "when a plaintiff (o[r] potentially a plaintiff's representative [that the plaintiff has chosen]) is unfamiliar with hearing procedures, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts' in order to satisfy [their] heightened duty" to develop the record that exists under these circumstances. *Presley v. Colvin*, 2:11-CV-00103, 2013 WL 5204816 (M.D. Tenn. Sept. 16, 2013) (citing *Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1052 (6th Cir.1983)). "However, if the ALJ or a non-attorney representative does perform a proper inquiry such that the plaintiff is not prejudiced…there is no cause for remand." *Presley* at *5 (citing *Kidd,* 283 F. App'x at 345)."

The record shows that the plaintiff was represented by a non-attorney, Mr. Groves, at both the initial hearing and the second hearing (DE 13, pp. 92, 119). The plaintiff argues that Mr. Groves' representation "trigger[ed] the ALJ's 'special duty to develop' the record (DE 16, p. 18). However, as explained, this argument disregards Sixth Circuit precedent which establishes that it

is a representative's unfamiliarity with administrative proceedings that triggers the ALJ's special, or heightened, duty. Failure of the ALJ to develop the record under this heightened duty and prejudice to the plaintiff would then result in remand. However, the plaintiff made no allegation of unfamiliarity, improper inquiry, insufficient development of the record, or prejudice because of Mr. Groves' representation after the initial hearing. In fact, as the Defendant argues, Mr. Groves was able to advocate for the plaintiff so successfully that he obtained a remand from the AC on her behalf (DE 13, pp. 233-34). The record shows that there was, therefore, no heightened duty on the part of the ALJ to develop the record because Mr. Groves was not unfamiliar with administrative proceedings. Nonetheless, the record shows that the ALJ met his duty to fully develop the record, as explained in the preceding paragraphs.

Therefore, the record provides substantial evidence that the ALJ properly met the basic duty to develop the record and did not fail to meet a special duty to develop the record.

**C. Whether the ALJ failed to consider the effect of Plaintiff's headaches on her RFC**

The plaintiff argues that the ALJ erred by failing to consider the functional limitations caused by the plaintiff's headaches and by failing to incorporate these limitations into the RFC determination. (DE 16, p. 19)

The ALJ determines the plaintiff's RFC based on all relevant evidence in the record, including: (1) medical history; (2) medical reports; (3) consultative examination reports; (4) medical source statements; (5) descriptions of symptom-based limitations; (6) plaintiff statements; and (7) family or third party statements. 20 C.F.R. §§ 404.1545(a)(3) and 416.945(a)(3). The ALJ also considers all of the plaintiff's medically determinable impairments, both severe and non-severe. 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2).

The record shows that the ALJ found that the plaintiff's headaches were severe at step 2 of the disability evaluation (DE 13, p. 12). The record shows that the ALJ then considered all of the relevant evidence in the record regarding the plaintiff's limitations from her headaches and incorporated these limitations into the RFC determination. The ALJ found that the plaintiff had the RFC "to perform light work" and had a "decreased ability for concentration that would not preclude simple work but would preclude detailed or complex work." (DE 13, p. 12).

The record shows that the ALJ cited the plaintiff's medical history and medical reports in which the plaintiff reported headaches or migraines. This ALJ noted that the plaintiff "frequently sought treatment at the local ER for complaints of headaches [and] [s]he reported that her headaches were less severe when she took prescribed Maxalt…." (DE 13, p. 13). The ALJ noted that the plaintiff "received treatment at the local Department of Health during the period of November 2010 through February 2011 [when] [s]he was assessed with…migraine headaches." (DE 13, p. 14). The ALJ noted that the plaintiff reported "a migraine headache that had improved" in February 2011 (DE 13, p. 14). The ALJ also noted that, separately, in February 2011, the plaintiff "was admitted to the local hospital…[and] discharged in stable condition with [a] diagnos[is] of migraine headache." (DE 13, p. 14). The ALJ went on to cite the consultative examination report of Dr. Keown (DE 13, p. 14), in which Dr. Keown found that the plaintiff's headaches that were most likely the result of untreated hypertension as opposed to migraines (DE 13, p. 376). The ALJ went on to cite the psychiatric medical source statement by Dr. Davis "who noted no more than mild mental limitations" (DE 13, p. 13) and whose report included no documentation of the plaintiff reporting subjective functional limitations from her headaches (DE 13, pp. 355-67). The ALJ went on to cite the plaintiff's testimony and her descriptions of her symptoms. The ALJ noted that the plaintiff testified she has "headaches twice weekly that

average 8 to 12 hours…she must remain in bed…in order to alleviate the severe headache [and that] [d]ue to severe pain, [she] is unable to work because she cannot concentrate, focus, or interact with others." (DE 13, p. 13).

Therefore, the record provides substantial evidence that the ALJ did not fail to address the functional limitations of the plaintiff's headaches when determining the plaintiff's RFC.

###   D.      Whether the ALJ failed to support his credibility determination

The plaintiff argues that the ALJ failed to support his credibility determination with substantial evidence. Specifically, the plaintiff argues that the ALJ:  (1) failed to consider the plaintiff's daily activities; and (2) erred by using boilerplate language, devoid of record support.

When making a disability determination, an ALJ uses a 2 part test to evaluate the plaintiff's symptoms. First, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." SSR 96-7P, 1996 WL 374186. Next, "the [ALJ] evaluate[s] the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7P, 1996 WL 374186. A plaintiff's symptoms will limit their ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. SSR 96-7P, 1996 WL 374186.  However, when the objective evidence does not reflect the severity of symptoms, the ALJ requires other evidence to determine the credibility of a plaintiff's statements about their symptoms. SSR 96-7P, 1996 WL 374186.  In this case, the ALJ must also consider 7 factors:  (1) daily activities; (2) location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) functional

limitations and restrictions. 20 C.F.R. §§ 404.1529(c) and 416.929(c). When the record shows that an "ALJ [has] considered the evidence in the record and provided specific reasons for [their] credibility findings, [their] decision is entitled to great deference and ***is supported by substantial evidence***." *Anthony v. Astrue*, 266 F. App'x 451, 460 (6th Cir. 2008) (emphasis added).

The record shows that the ALJ properly evaluated the plaintiff's credibility and supported his determination with substantial evidence. The ALJ noted the plaintiff's testimony and her asserted symptoms, namely "migraine headaches; back and neck pain…pain into her ankles and legs…shortness of breath when walking even minimal distances...can stand for one hour…sit for 3…spends most of her day in bed…must remain in bed…to alleviate…severe headache[s]…unable to work because she cannot concentrate, focus, or interact with others." (DE 13, p. 13). The record shows that the ALJ then followed the 2 step process for evaluating the credibility of the plaintiff's symptoms, pursuant to SSR 96-7P, at step 4 of his disability determination, when the ALJ determines the plaintiff's RFC.

The ALJ first found that "the [plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (DE 13, p. 13). Next, the ALJ evaluated the intensity, persistence, and limiting effects of the plaintiff's symptoms based on both objective medical evidence and the 7 factors under 20 C.F.R. §§ 404.1529(c) and 416.929(c). The plaintiff focuses her substantial evidence contention on the assertion that the ALJ failed to appropriately consider the plaintiff's daily activities, the first factor under C.F.R. §§ 404.1529(c) and 416.929(c). The plaintiff argues that "the ALJ failed to consider that [p]laintiff testified that she experiences shortness of breath when walking to the mailbox and reported suffering from memory loss, which causes her to need to be reminded to take medication and to pay the bills" (DE 16, p. 21). The plaintiff further argues that "it is unclear

how [p]laintiff's limited abilities to walk to the mailbox, attend to her personal care needs, and watch television demonstrate her ability to work…." (DE 16, p. 21).

The record shows that the ALJ appropriately considered the plaintiff's activities and did so as part of his consideration of the plaintiff's credibility, not as a demonstration of the plaintiff's ability to work. The ALJ documented the plaintiff's testimony of her "shortness of breath" and inability to concentrate (DE 13, p. 13). The ALJ documented the evaluation that Mr. Herman conducted, in which Mr. Herman documented the plaintiff's report of her daily activities and in which Mr. Herman found that the plaintiff's long and short term memory were intact (DE 13, pp. 383-88). Mr. Herman documented that the plaintiff self-reported needing reminders for medication, but being able to manage finances (DE 13, p. 367). The ALJ documented the psychiatric and mental RFC assessment that Dr. Davis conducted, in which he found that the plaintiff was "capable of understanding and remembering simple and multistep instructions," and "had limited concentration but could attend to said tasks for periods of at least two hours in an eight hour day and complete a routine workweek…." (DE 13, p. 13). The record also shows that the plaintiff reported conflicting information about her memory on the SSA Function Report (DE 13, pp. 307-14). While she marked "memory" as being affected, she also reported that she is able to pay bills, count change, handle a savings account, and use a checkbook or money order  (DE 13, pp. 310; 312). She reported that her ability to handle money had not changed since her illness, injury, or condition began (DE 13, p. 311). Therefore, the record shows that the ALJ had sufficient evidence on which to rely for his credibility determination.

Finally, the plaintiff argues that the ALJ erred by using the following, purportedly boilerplate, language:  "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

above RFC assessment." (DE 16, p. 21). The Sixth Circuit addressed a similar argument in *Norris v. Commissioner of Social Security*, where the plaintiff "contend[ed] [that] the ALJ failed to follow agency regulations by improperly relying on 'boilerplate' language…." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012). However, the Court in *Norris* found:

> In making the RFC determination, the ALJ gave a detailed recitation of all the evidence presented, ranging from the medical records…to the opinions of consultants retained by [the plaintiff]. In addition, the ALJ explained that it relied on the same evidence forming the basis of the adverse-credibility finding—namely, the nature of the treatments prescribed, the results of various medical tests administered, and [the plaintiff's] reported ability to function in daily life—to determine…RFC. In so doing, the ALJ's RFC determination was premised ***on more than mere boilerplate assertions*** and demonstrated meaningful engagement with the facts presented in the record.

*Norris*, 461 F. App'x at 440-41 (emphasis added). Here, the record shows that the ALJ also gave a detailed recitation of all the evidence presented and based his RFC determination on more than boilerplate assertions. The ALJ considered the reports of Dr. Payne (DE 13, p. 12, citing 67F); Dr. Keown (DE 13, p. 12, citing 187F); Dr. Davis (DE 13, p. 13, citing 204-214F); and Mr. Herman (DE 13, p. 14, citing 181-186F).[22] The ALJ considered the medical evidence from Cookeville and Cookeville ER, Cumberland Clinic, the Tennessee DOH, and Livingston (DE 13, pp. 13-15). Therefore, the record shows that the ALJ based his credibility determination on the evidence of record as opposed to pontificating mere boilerplate phrases.

Therefore, the record provides substantial evidence that the ALJ appropriately considered the plaintiff's daily activities and did not err by using purportedly boilerplate language.

### E.    Whether the ALJ's Step 5 determination is unsupported by substantial evidence

The plaintiff argues that the testimony of the VE could not provide substantial evidence to support the ALJ's step 5 finding because the testimony of the VE was based on an incomplete

---

22 The Court notes that the pages cited within the ALJ decision do not correspond to the Bates stamp, but correspond to an alternative coding system used within the record.

hypothetical. The plaintiff argues that the hypothetical was incomplete because the ALJ erred in evaluating the plaintiff's RFC and credibility. The plaintiff again argues that the ALJ failed to consider the plaintiff's obesity.

The Sixth Circuit has found that "[a] VE's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Thomas v. Comm'r of Soc. Sec*., 13-1666, 2014 WL 128175 (6th Cir. Jan. 15, 2014) (citing *Smith v. Halter,* 307 F .3d 377, 378 (6th Cir.2001)). The record shows that the ALJ presented a hypothetical question to the ALJ:

> A person approaching 54 years of age, who has a limited education, and past relevant work identical to that of the plaintiff. The person would be limited to light exertion.[23] The person would have decreased concentration which would not preclude simple work but would preclude detailed work or complex work. The person could relate superficially with others, and could adapt to routine work occasionally.

(DE 13, p. 590). In response, the VE testified that, under this hypothetical, the plaintiff could not perform her past relevant work, but that there would be other light, unskilled jobs that the plaintiff could perform (DE 13, pp. 590-91). The record shows that the hypothetical was not, as the plaintiff argues, incomplete based on any error by the ALJ in evaluating the plaintiff's RFC or credibility. Instead, the hypothetical accurately reflected the plaintiff's physical and mental impairments because, as discussed above,[24] the ALJ determined the plaintiff's RFC based on all relevant evidence in the record and, also as discussed above,[25] the ALJ supported his credibility determination with substantial evidence. Further, the limitations that the ALJ determined at step 5 were consistent with the limitations presented to the VE in the hypothetical at the hearing (DE

23 20 C.F.R. §§ 404.1567 and 416.967 (The "light exertion" limitation means exertion that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

24 *See Supra* Part IV.C.

25 *See Supra* Part IV.D.

13, pp. 12; 590). Therefore, the record provides substantial evidence that the testimony of the VE could provide substantial evidence to support the ALJ's step 5 finding.

The record provides substantial evidence that the ALJ properly considered the plaintiff's obesity, as required by SSR 02-1p, and as discussed at length above.[26]

## V.    Conclusion

The record provides substantial evidence to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard.

## VI.    Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 15) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 1st day of April, 2014.


s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge

---

26 *Supra* Part IV.A.